UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAH ALAM,<br><br>        Plaintiff,<br><br>  -against-<br><br>FAIRSTEAD MANAGEMENT LLC and JEFFREY GOLDBERG,<br><br>        Defendants. | Case No. 1:24-cv-849<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shah Alam ("Plaintiff"), a former employee who was systematically discriminated against by Defendant Fairstead Management LLC ("Fairstead") and Fairstead CEO Jeffrey Goldberg ("Goldberg," and together with Fairstead, "Defendants") alleges as follows:

**NATURE OF THE CASE**

1. Fairstead is a New York-based real estate company that is one of the nation's largest affordable housing owners. Its website claims that it is "people-centered," and is "guided by thoughtful corporate governance" to "improve individual lives, reshape communities, and spark societal change."

2. Under the stewardship of its CEO Goldberg, Fairstead does not come close to meeting these lofty goals.

3. Goldberg hired Plaintiff Shah Alam in August 2020 to be President of Fairstead's in-house property management company. After successfully growing Fairstead's property management capabilities, Alam eventually became a Managing Partner at Fairstead.

4. The terms of Alam's employment were governed by an August 5, 2020 employment agreement between Alam and Fairstead (the "Agreement").

5. Under the Agreement, Alam was entitled to base compensation and a minimum annual guaranteed bonus, to be paid in full no later than March 31 of the next year. Under the Agreement, if Alam was terminated "without cause," he was still eligible for a pro-rata share of the guaranteed annual bonus.

6. After Alam started working for Fairstead in September 2020, the company went from managing about 3,500 housing units to more than 16,500 units by 2022. Alam successfully grew the property management arm of Fairstead from around 100 employees to more than 500.

7. But after his first few months at Fairstead, Alam – who is from Pakistan and is Muslim – began to see that Goldberg was a bully and a racist. During Alam's time at Fairstead, Goldberg repeatedly made discriminatory comments, undermined him in his position as President at the company, and disregarded his religious holidays and practices. The pattern ended in Fairstead terminating Alam's employment and refusing to pay Alam his fully earned compensation.

8. Goldberg told employees with dark skin, "I thought you all were from the same country." When Alam took time away from work to celebrate Muslim holidays, Goldberg treated Alam as if he were still on the clock, and even called him about work issues while he was at his mosque in prayer. Goldberg respected the holidays of non-Muslim employees. Goldberg said Alam and a Middle Eastern co-worker were "from the same place" based on the color of their skin. Goldberg also derisively said that Alam, who is from Pakistan, had the "same culture" as one of Alam's IT employees, who is from India.

9. In addition to being the CEO of Fairstead, Goldberg works as a partner at the law firm Sadis & Goldberg LLP, where he is a member of the executive committee and purports to

serve as outside counsel to "numerous family offices."  In other words, Goldberg knew that his actions were unlawful.

10. When Alam discussed Goldberg's comments with HR, he was told that is "just how Goldberg is."

11. In early 2023, Fairstead owner and primary investor Stuart Feldman met with employees to gauge how they thought Fairstead was doing.  In his meeting with Feldman, Alam was candid about problems he saw at Fairstead.  Among other things, Alam said that (i) Goldberg had fired people without paying them what they were owed, (ii) Fairstead had made misrepresentations to the U.S. Department of Housing and Urban Development by saying that it would invest in certain properties that it then never invested in, and (iii) Fairstead's HR and accounting departments were not complying with certain legal and regulatory requirements.  Alam left the meeting with Feldman believing that Feldman appreciated his honesty and would make necessary changes at Fairstead.

12. But on May 11, 2023, Alam was summoned to a meeting with Goldberg and Fairstead's general counsel and was told he would be terminated.  At the meeting, Goldberg said he knew Alam had reported various legal and regulatory violations to Feldman.

13. Goldberg admitted that because of Alam's comments to Feldman, Alam and Fairstead were going to "go their separate ways."

14. Goldberg fired Alam to retaliate for Alam's warnings to Fairstead management that the company – and Goldberg – were violating legal and regulatory requirements.

15. To induce Alam to continue to work for a few more weeks, Goldberg reiterated that the bonuses for 2022 and 2023, that were detailed in the Agreement, would still be paid to Alam.

16. Based on the representations made by Goldberg, Alam agreed to keep working for a few more weeks.

17. Alam's employment was officially terminated on July 7, 2023.

18. Despite Goldberg's promises and the clear language of the Agreement, Fairstead did not pay Alam the minimum bonuses for 2022 and 2023 that he is entitled to.

19. Alam now seeks to hold Defendants accountable by bringing claims for (i) breach of his employment Agreement, (ii) unpaid wages, (iii) national origin and religious discrimination, and (iv) unlawful termination in violation of public policy.

## THE PARTIES

20. Plaintiff Shah Alam is an individual residing in Mount Airy, Maryland.

21. During his time at Fairstead, Alam worked from his home or from an office in Bethesda, Maryland. Alam frequently and regularly traveled to Fairstead's offices in New York City during his time there and spent multiple days in the office during these trips.

22. Defendant Fairstead Management LLC is a limited liability corporation organized under the laws of New York with its principal place of business at 250 West 55th Street, New York, New York 10012.

23. At all relevant times, Defendant Jeffrey Goldberg was Chief Executive Officer of Fairstead and worked out of either Fairstead's New York office or the New York office of the law firm Sadis & Goldberg LLP at 551 Fifth Avenue, New York, New York 10176. Upon information and belief, Goldberg resides in Manhattan.

24. At all relevant times, Goldberg was Alam's direct supervisor, and had operational control over the day-to-day operations of Fairstead, controlled significant functions of Fairstead's

business, and had authority to hire and fire Fairstead employees with jobs that were substantially similar to Alam.

25. Fairstead's website acknowledges that Goldberg "leads and directs all investment and operational decision making for the company."[1]

## JURISDICTION AND VENUE

26. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that (a) Plaintiff is a resident of Maryland and Defendants are residents of New York, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

27. The Court has supplemental jurisdiction over the claims arising from state law under 28 U.S.C. § 1367.

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because (i) Defendants reside in this district; and (ii) a substantial part of the events underlying this action occurred in this District.

29. Venue is also proper in this district because the Agreement states that the parties to it "irrevocably consent to the sole and exclusive personal jurisdiction of the federal and state courts located in New York County and waive any and all objections to the forum on the grounds that it is inconvenient or improper."

---

[1] See https://fairstead.com/ceo/ (last accessed Feb. 6, 2024).

## FACTS

**A.     Background**

30.     Plaintiff Shah Alam is a native of Pakistan who received a BA in accounting there and then came to the U.S. for further schooling in accounting. Alam is Muslim.

31.     After moving to the U.S., Shah began working in the real estate industry, and ultimately worked for multiple high-profile companies in property management – overseeing and managing the daily workings of real estate investments – including Sexton Companies, Edgewood Management and The Related Companies.

32.     Fairstead was founded by Goldberg and his brother in 2014. It has grown to be one of the country's largest apartment landlords, with a portfolio of properties stretching across 28 states and some 24,000 units, valued at more than $6 billion. Most of Fairstead's units receive some kind of federal subsidy.

33.     While Goldberg serves as Fairstead's CEO, he is also a partner at the law firm Sadis & Goldberg LLP, where he is a member of the firm's Executive Committee. His firm bio states that Goldberg "concentrates his practice in real estate, finance and corporate, with a special focus on family offices and entrepreneurs," and he purports to "serve as general counsel to numerous family offices."[2]

34.     On September 30, 2020, after more than a dozen interviews with Goldberg, Feldman and Goldberg's then-partners Will Blodgett and John Tatum, Alam joined Fairstead as President of its in-house property management company.

35.     Alam worked from Maryland during his time at Fairstead, eventually out of a Fairstead office in Bethesda, Maryland.

---

[2] See https://www.sadis.com/professionals/jeffrey-c-goldberg (last accessed Feb. 6, 2024).

36. While Alam mostly worked from Maryland while at Fairstead, he regularly traveled to Fairstead's offices in New York every few weeks to work from there. On these trips to work out of Fairstead's offices, Alam typically stayed in New York for multiple days.

37. Alam's first years at Fairstead were a success, as he built out Fairstead's in-house property management capabilities as Goldberg asked him to. The company went from managing about 3,500 units to more than 16,600 units between 2020 and 2022 under Alam's direction.

38. With Goldberg's encouragement, Alam also hired and grew Fairstead's property management team from about 100 employees to more than 500.

39. In 2021, Alam was made Managing Partner at Fairstead.

40. Throughout his time at Fairstead, Alam never received a negative performance review.

**B.    Goldberg Discriminates Against Alam**

41. Evan as Alam did exactly what Goldberg wanted him to do with Fairstead's property management arm, Alam began to see that Goldberg was a bully and a racist.

42. Goldberg also ignored Alam's concerns about what his property management team saw and heard about Fairstead's properties. Alam told Goldberg in 2022 that Fairstead was violating its legal obligations by not paying vendors on time. Goldberg ignored him.

43. Goldberg often undermined, yelled at, cut off, and generally disrespected Alam.

44. Goldberg did not act this way towards other executives at Fairstead who were white, and Alam eventually realized that Goldberg acted differently towards him because he was a dark-skinned Muslim man from Pakistan.

45. Goldberg routinely made comments like, "I thought you were all from same country," when referring to people of color.

46. When Alam took time away from work to celebrate Muslim holidays, Goldberg continued to act as if Alam was still at work, including calling Alam several times while he was at his mosque in prayer.

47. In contrast, the entire Fairstead team was given time off for Jewish and Christian holidays, even as Muslim holidays were neither acknowledged nor respected.

48. Goldberg derisively said that Alam "had the same culture" as one of his IT employees, who is from India.

49. On another occasion, Goldberg said Alam was "from the same place" as a dark-skinned Israeli co-worker.

50. Fairstead HR was very much aware of Goldberg's derogatory comments and behavior. HR employees often sat in on routine meetings with Goldberg, apparently out of concern he would say or do something inappropriate, which he often did.

51. Alam raised his concerns about Goldberg's comments with HR but was told "that's just the way he is." HR reps claimed to have raised these concerns with Goldberg in the past but his behavior had not changed.

**C.    Defendants Fire Alam**

52. In the first quarter of 2023, Fairstead's owner Feldman met with employees to ask how they thought Fairstead was doing.

53. Alam met with Feldman and gave his honest view about issues at Fairstead.

54. Alam told Feldman that Fairstead's HR and accounting departments were not complying with legal and regulatory requirements.

55. Alam told Feldman that Goldberg violated labor laws by firing Fairstead employees without paying them what they were owed.

56. Alam told Feldman that Fairstead told the U.S. Department of Housing and Urban Development that it would invest in certain properties that Shah managed but had not done so.

57. Alam left his meeting with Feldman believing that it had been constructive and that Feldman appreciated his honesty and intended to make positive changes at Fairstead.

58. Instead, Alam was summoned to a meeting with Goldberg and Fairstead's general counsel Seth Hoffman on May 11, 2023. Goldberg immediately said he knew Alam had talked to Feldman, and because of that conversation said it was best for Alam and Fairstead to "go their separate ways."

59. Goldberg told Alam in the presence of Hoffman that Fairstead would nonetheless pay Alam his bonus for 2022 and a pro-rated bonus for 2023.

60. Alam was shocked – he had been candid with Feldman because he thought it would lead to positive change at the company. Alam had never had a negative performance review at Fairstead and had never been told that his job was in danger.

61. Alam's last day at Fairstead was July 7, 2023.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT

62. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

63. On August 5, 2020, Defendant Fairstead executed a letter agreement (the "Agreement") governing Plaintiff's employment at Fairstead.

64. The Agreement is a valid and binding contract.

65. Plaintiff fulfilled his obligations under the contract.

9

66. Under the Agreement, Defendant Fairstead agreed to pay Plaintiff a minimum annual guaranteed bonus payment of $100,000, to be paid in full in one lump-sum payment no later than March 31 of the following calendar year.

67. Under the Agreement, if Plaintiff was terminated without cause during the calendar year, Plaintiff was eligible for a pro-rata share of the annual guaranteed $100,000 bonus.

68. Defendant Fairstead breached its obligations under the contract by failing to pay Plaintiff his guaranteed minimum bonus for 2022 or pro-rata share of the guaranteed minimum bonus for 2023.

69. Defendant Fairstead's breaches are material.

70. Defendant Fairstead's breaches are willful, wanton and intentional.

71. Defendant Fairstead's breaches have caused damage to Plaintiff.

72. Accordingly, the Court should award damages against Defendant Fairstead for breach of contract in an amount to be proven at trial.

## COUNT TWO
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

73. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

74. Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance.

75. The implied covenant embraces a pledge that neither party will do anything that will destroy or injure the right of the other party to receive the fruits of the contract.

76. On August 5, 2020, Plaintiff and Defendant Fairstead entered into the valid and binding Agreement governing the terms of Plaintiff's employment.

77. Defendant Fairstead owed Plaintiff a duty to act in good faith and conduct fair dealing in connection with the Agreement.

78. Defendant Fairstead breached the implied covenant of good faith and fair dealing that existed in the Agreement when it terminated Plaintiff for having an honest conversation about the company with its owner Stuart Feldman at Feldman's express request.

79. Plaintiff was performing his duties under the Agreement and providing honest feedback and insight to Feldman at Feldman's express request.

80. Defendant Fairstead retaliated against Plaintiff by terminating him for participating in an honest discussion about the company.

81. Defendant Fairstead's retaliation was an unfair action taken in bad faith, which resulted in the termination of Plaintiff's employment.

82. Accordingly, the Court should award damages against Defendant Fairstead for breach of covenant of good faith and fair dealing in an amount to be proven at trial.

## COUNT THREE
## MARYLAND WAGE PAYMENT AND COLLECTION LAW

83. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

84. Defendant Fairstead is an employer under the Maryland Wage Payment and Collection Law.

85. Plaintiff Alam is an employee under the Maryland Wage Payment and Collection Law.

86. The annual guaranteed bonus payments that Fairstead owes to Alam for 2022 and 2023 are "wages" under the Maryland Wage Payment and Collection Law.

87. Defendant Fairstead violated the Maryland Wage Payment and Collection Law by withholding from Plaintiff the annual guaranteed bonus payments due to him under the Agreement for 2022 and 2023.

88. There is no bona fide dispute that Plaintiff is entitled to the annual guaranteed bonus payments under the Agreement for 2022 and 2023.

89. As a result of these breaches, Plaintiff has suffered damages in an amount to be determined at trial, plus reasonable attorneys' fees, costs of the action, treble damages, plus interest.

## COUNT FOUR
## VIOLATION OF NEW YORK LABOR LAW § 193

90. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

91. Defendant Fairstead is an employer under New York Labor Law 190(3) and 193(1).

92. Plaintiff Alam is an employee under New York Labor Law 190(2) and 193(1).

93. The annual guaranteed bonus payments that Fairstead owes Alam for 2022 and 2023 are "wages" under Article 6 of the New York Labor Law.

94. Defendant violated New York Labor Law 193(1) by withholding from Plaintiff the annual guaranteed bonus payments under the Agreement for 2022 and 2023.

95. Defendant did not have a good-faith basis to believe that this underpayment complied with the law.

96. As a result of these breaches, Plaintiff has suffered damages in an amount to be determined at trial, plus reasonable attorneys' fees, costs of the action, liquidated damages equal to 100 percent of the compensation found to be due, plus interest.

## COUNT FIVE
### VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a)
### RELIGIOUS AND NATIONAL ORIGIN DISCRIMINATION

97. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

98. Defendants are liable under Section 296 of the New York Executive Law as employers and because they aided and abetted the discrimination that Plaintiff suffered at Fairstead.

99. Defendants discriminated against Plaintiff in violation of Section 296, subdivision 1(a), of the New York Executive law by failing to accommodate Plaintiff's religious observances and by undermining and terminating Plaintiff because of his religion and national origin as a Muslim and Pakistani man, and permitting, enabling, and encouraging its agents to engage in such behavior.

100. Defendants have engaged in, among other things, the following unlawful and/or discriminatory conduct:

- Undermining Plaintiff's supervision and management of his team, unlike similarly situated white, non-Muslim employees;
- Not making reasonable accommodations for Plaintiff's religious observances, unlike similarly situated white, non-Muslim employees;
- Terminating Plaintiff.

101. Upon information and belief, other Muslim and South Asian employees were also discriminated against.

102. As a result of Defendants' conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

103. Because of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York Executive Law.

## COUNT SIX
## VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 1(a) RELIGIOUS AND NATIONAL ORIGIN DISCRIMINATION

104. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

105. Defendants are liable under Section 8-107 of the New York City Administrative Code as employers and because they aided and abetted the discrimination that Plaintiff suffered at Fairstead.

106. Defendants discriminated against Plaintiff in violation of Section 8-107, subdivision 1(a), of the New York City Administrative Law by failing to accommodate Plaintiff's religious observances and by undermining and terminating Plaintiff because of his religion and national origin as a Muslim and Pakistani man, and permitting, enabling, and encouraging its agents to engage in such behavior.

107. Defendants have engaged in, among other things, the following unlawful and/or discriminatory conduct:

- Undermining Plaintiff's supervision and management of his team, unlike similarly situated white, non-Muslim employees;

- Not making reasonable accommodations for Plaintiff's religious observances, unlike similarly situated white, non-Muslim employees;

- Terminating Plaintiff.

108. Upon information and belief, other Muslim and South Asian employees were also discriminated against.

109. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff.

110. As a result of Defendants' conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

111. Because of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

**COUNT SEVEN**
**WRONGFUL TERMINATION IN VIOLATION OF MARYLAND PUBLIC POLICY**

112. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

113. Defendant Fairstead terminated Plaintiff on or about July 7, 2023.

114. Plaintiff's termination violated a clear mandate of public policy because Plaintiff was terminated for reporting that: (i) Defendant Goldberg had fired Fairstead employees without paying them wages they were entitled to, (ii) Defendant Fairstead had made misrepresentations to the U.S. Department of Housing and Urban Development that it would invest in certain properties that Shah managed and had never done so; and (iii) Fairstead's HR and accounting departments were not complying with legal and regulatory requirements.

115. Plaintiff reported these concerns to Defendant Fairstead's ownership before Defendants' termination of his employment.

116. Plaintiff's concerns were reasonable concerns about Defendants' violations of Maryland public policy and U.S. laws, rules or regulations.

117. Plaintiff's protected activity was a motivating factor in Defendants' decision to terminate his employment.

118. Plaintiff has suffered damages in an amount to be determined at trial because of Defendants' unlawful termination of his employment.

## PRAYER FOR RELIEF

Wherefore, Shah Alam prays for judgment and relief as follows:

A. Award back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by Plaintiff, in an amount not less than $2,000,000;

B. Award nominal, liquidated, and compensatory damages to Plaintiff, in an amount not less than $2,000,000;

C. Award punitive damages to Plaintiff;

D. Order Fairstead to make Plaintiff whole by providing him with any other monetary and affirmative relief;

E. Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees and expert witness fees, to Plaintiff;

F. Award Plaintiff all prejudgment interest and post-judgment interest available under law;

G. Award Plaintiff any other appropriate equitable relief, including reinstatement;

H. Order that this Court retain jurisdiction of this action until the Court is satisfied that Fairstead has remedied the practices complained of here and is determined to be in full compliance with the law; and

I. Award additional and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable of right by jury.

**DATED:**   New York, New York
February 6, 2024

_____
Rishi Bhandari

MANDEL BHANDARI LLP
Rishi Bhandari
Donald Conklin
80 Pine Street, 33rd Floor
New York, NY 10005
T: (212) 269-5600
F: (646) 964-6667
rb@mandelbhandari.com
dc@mandelbhandari.com

*Attorneys for Plaintiff Shah Alam*