UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAH ALAM,

Plaintiff,

— against —

FAIRSTEAD MANAGEMENT LLC and JEFFREY GOLDBERG,

Defendants.

Case No. 1:24-CV-00849-NRB

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MANDEL BHANDARI LLP
Donald Conklin
Rishi Bhandari
80 Pine Street, 33rd Floor
New York, NY 10005
T: (212) 269-5600
F: (646) 964-6667
dc@mandelbhandari.com
rb@mandelbhandari.com

*Attorneys for Plaintiff Shah Alam*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ........................................................................................3

A. Fairstead Is a New York Company and Hired Alam Under a New York Employment Agreement.......................................................... 3

B. Under the Agreement, Alam Was Entitled to Guaranteed Annual Bonuses .................. 6

C. Alam Regularly Worked From Fairstead's New York Offices at Defendants' Direction ............................................................ 6

D. Alam Reported Concerns to Fairstead's Owner and Was Terminated at Fairstead's New York Offices..................................................... 9

E. Defendants' Withholding of Maryland Taxes Is Not a Legal Determination About Which Law Governs ...................................... 10

F. Defendants' Practice of Making Employees 'Run the Departure Gauntlet'................. 10

LEGAL STANDARD........................................................................................11

ARGUMENT........................................................................................12

I. NEW YORK LAW APPLIES TO ALAM'SWHISTLEBLOWER CLAIMS ..................12

II. NEW YORK LAW APPLIES TO ALAM'S UNPAID WAGE CLAIMS .......................14

A. The Agreement's Choice of Law Provision Means NYLL Applies............................ 14

B. Alam Is Entitled to Liquidated Damages............................................................. 16

III. THE MOTION'S OTHER DEFENSES FAIL ..................................................18

A. Tax Estoppel Doctrine Does Not Bar Alam's Claims ................................................ 18

B. Defendants' 'Faithless' Conduct Allegations Are Disputed, Scurrilous and Irrelevant20

IV. THE MOTION'S NYLL ANALYSIS MISSES THE MARK ........................................21

A. The Cases the Motion Cites Are Not Controlling...................................................... 22

B. New York Choice of Law Analysis Mandates NYLL................................................. 25

CONCLUSION........................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Accettola v. He*, No. 23-cv-1983(LJL),
2025 WL 843412 (S.D.N.Y. Mar. 18, 2025) ..... 12

*Alvarez v. IBP, Inc.*,
339 F.3d 894 (9th Cir. 2003) ..... 17

*Barfield v. New York City Health & Hosps. Corp.*,
537 F.3d 132 (2d Cir. 2008) ..... 16

*Bickerstaff v. Vassar Coll.*,
196 F.3d 435 (2d Cir. 1999) ..... 12

*Brod v. Omya, Inc.*,
653 F.3d 156 (2d Cir. 2011) ..... 11

*Carnett v. TIAA Ins. Co.*,
24-CV-9991, 2026 WL 35348 (S.D.N.Y. Jan. 6, 2026) ..... 23

*Chambers v. TRM Copy Ctrs. Corp.*,
43 F.3d 29 (2d Cir. 1994) ..... 12

*Chavez-Deremer v. Sarene Servs., Inc.*,
No. 20-cv-3273, 2026 WL 467788 (E.D.N.Y. Feb. 18, 2026) ..... 17

*Dittes v. ChargeAfter USA, Inc.*,
No. 24-CV-746 (RA), 2025 WL 1984273 (S.D.N.Y. July 17, 2025) ..... 24

*Elsen v. Defren*,
283 A.D.2d 109 (1st Dep't 2001) ..... 26

*Fried v. LVI Servs., Inc.*,
500 Fed. Appx. 39 (2d Cir. 2012) ..... 24

*Fried v. LVI Servs., Inc.*,
No. 10 Civ. 9308, 2011 WL 4633985 (S.D.N.Y. Oct. 4, 2011) ..... 24

*Goldberg v. Bespoke Real Est. LLC*,
No. 23 Civ. 5614 (JPO), 2024 WL 1256006 (S.D.N.Y. Mar. 25, 2024) ..... 13, 14, 22

*Guilbert v. Gardner*,
480 F.3d 140 (2d Cir. 2007) ..... 11

*Hobbs v. Knight-Swift Transp. Holdings, Inc.*,
No. 21-cv-01421, 2025 WL 1577271 (S.D.N.Y. June 4, 2025) ..... 22

*Hoffman v. Parade Publ'ns*,
15 N.Y.3d 285 (2010) ........ 24

*Hubbell-Petang v. Hotel Rsrv. Serv.*,
No. 20 Civ. 10988, 2022 WL 602900 (S.D.N.Y. Mar. 1, 2022) ........ 24

*In re Stage Presence Inc.*,
559 B.R. 93 (Bankr. S.D.N.Y. 2016) ........ 20

*In re Tran*,
No. 2012-1785/A, 2014 WL 2216162 (Sur. Ct. N.Y. Cnty. May 22, 2014) ........ 19

*Inclan v. N.Y. Hosp. Grp., Inc.*,
95 F. Supp. 3d 490 (S.D.N.Y. 2015) ........ 17

*Johnson v. Everyrealm, Inc.*,
657 F.Supp.3d 535 (S.D.N.Y. 2023) ........ 25

*Kim v. Family Bob Inc.*,
No. 20-cv-906, 2021 WL 7906544 (E.D.N.Y. Jan. 26, 2021) ........ 22, 25

*Kingston v. Int'l Bus. Machines Corp.*,
187 A.D.3d 578 (1st Dept. 2020) ........ 24

*Kraiem v. JonesTrading Institutional Servs. LLC*,
492 F. Supp. 3d 184 (S.D.N.Y. 2020) ........ 25

*Krock v. Lipsay*,
97 F.3d 640 (2d Cir. 1996) ........ 27

*Levinson v. Primedia Inc.*,
No. 02 Civ. 2222, 2007 WL 2298406 (S.D.N.Y. Aug. 9, 2007) ........ 15

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
739 F.3d 45 (2d Cir. 2013) ........ 27

*Magner v. Alvanon, Inc.*,
No. 24-cv-09190, 2026 WL 550017 (S.D.N.Y. Feb. 26, 2026) ........ 20, 22, 27

*Mahoney-Buntzman v. Buntzman*,
12 N.Y.3d 415 (2009) ........ 18, 19, 20

*Matter of Allstate Ins. Co. (Stolarz)*,
81 N.Y.2d 219 (1993) ........ 26

*Matter of Excelsior 57th Corp. (Kern)*,
218 A.D.2d 528 (1st Dep't 1995) ........ 19

*Medtronic Inc. v. Walland*,
No. 21 Civ. 2908 (ER), 2021 WL 4131657 (S.D.N.Y. Sept. 10, 2021) .................................. 15

*Melius v. Restaurant Opportunities Ctr. United, Inc.*,
No. 21-cv-02554, 2021 WL 4868557 (S.D.N.Y. Oct. 15, 2021) ............................................ 23

*Ministers & Missionaries Benefit Bd. v. Snow*,
26 N.Y.3d 466 (2015) ..................................................................................................... 15, 16

*Padula v. Lilarn Props. Corp.*,
84 N.Y.2d 519 (1994) ................................................................................................ 22, 26, 27

*Pakniat v. Moor*,
192 A.D.3d 596 (1st Dept. 2021) ........................................................................................... 24

*Pickering v. Teladoc Health Inc.*,
No. 24-445-RGA-SRF, 2025 WL 2802954 (D. Del. Oct. 1, 2025) ............................... 8, 14, 22

*Rana v. Islam*,
887 F.3d 118 (2d Cir. 2018) ................................................................................................... 17

*Rinaldi v. Mills*,
No. 21-2630, 2022 WL 17480081 (2d Cir. Dec. 7, 2022) ...................................................... 13

*Smith v. Mitlof*,
148 F. Supp. 2d 279 (S.D.N.Y. 2001) ..................................................................................... 26

*Syeed v. Bloomberg L.P.*,
41 N.Y.3d 446 (2024) .............................................................................................................. 25

*Syeed v. Bloomberg L.P.*,
58 F.4th 64 (2d Cir. 2023) ................................................................................................. 22, 25

*Velez v. McHugh*,
No. 09-CV-0925, 2011 WL 778693 (S.D.N.Y. Mar. 2, 2011) ................................................ 12

*Ware v. L-3 Vertex Aerospace*,
833 Fed. Appx. 357 (2d Cir. 2020) ......................................................................................... 24

*Wholey v. Sears Roebuck*,
370 Md. 38 (2002) ................................................................................................................... 26

*Willis Re Inc. v. Herriot*,
550 F. Supp. 3d 68 (S.D.N.Y. 2021) ....................................................................................... 15

*Wood v. Artifact Props., LLC*,
169 A.D.3d 1503 (4th Dep't 2019) ......................................................................................... 19

**Statutes**

New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* .................. 16, 22, 25

New York Labor Law § 215 .......................................................................... 1, 9, 12, 22

New York Labor Law § 740 ................................................................................. passim

New York Labor Law §§ 190 *et seq.* ................................................................... 1, 16, 22

New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ................................. 22, 25

**Other Authorities**

*John H. Chun,*
*2 Approaches to NY Choice of Law in Employment Contracts*, LAW360 (May 13, 2022) ....... 15

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................ 21

# TABLE OF ABBREVIATIONS

| Abbreviation | Item |
|---|---|
| Dkt. __ | Docket entries in this action |
| FAC | Plaintiff's First Amended Complaint [Dkt. 25] |
| Answer | Defendants' Answer With Counterclaim [Dkt. 41] |
| Motion | Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment [Dkt. 62] |
| MTD Order | February 26, 2025 Memorandum and Order on Defendants' Motion to Dismiss [Dkt. 32] |
| Agreement | Employment Agreement between Plaintiff and Fairstead Management LLC [Dkt 28-1] |
| NYLL | New York Labor Law |
| NYCHRL | New York City Human Rights Law,<br>N.Y.C. Admin. Code §§ 8-101 *et seq*. |
| NYSHRL | New York State Human Rights Law,<br>N.Y. Exec. Law §§ 290 *et seq*. |

## PRELIMINARY STATEMENT

Defendants hired Shah Alam in 2020 to be President of Fairstead's in-house property management company and dramatically grow that division at an unprecedented rate. He did it. They required him to frequently and routinely travel to New York. He did that, too – documents Defendants produced in this case so far show that Alam traveled to New York for work several times a month on average during his time at Fairstead. After he complained in New York about Fairstead not paying its employees what they were owed, Defendants summoned him to their Manhattan offices and fired him in person. His employment Agreement with Defendants, which has a New York choice-of-law and venue provision, required Defendants to pay Alam a mandatory annual bonus. They refused to pay it until after he sued them.

Defendants do not dispute any of this. Yet they now ask the Court to dismiss Alam's claims alleging that Defendants violated New York Labor Law §§ 190 *et seq*., 215 and 740 for unpaid wages and whistleblower retaliation. To distract from dispositive facts they cannot contest, Defendants devote most of their Motion to unsupported ad hominem attacks they admit are irrelevant – attacks that will be addressed as discovery continues. They also fabricate an alternate universe in which Alam's presence in New York was "extremely sporadic and entirely merely incidental."

But this is not a case where a plaintiff tangentially connected to New York invokes the New York Labor Law. Here, a New York company hired a senior executive under a New York-governed employment agreement, required him to travel regularly to its New York headquarters, fired him in person at its New York offices for reporting that New York law had been violated, and then refused to pay compensation owed under the Agreement. Every thread of this

employment relationship runs through New York, and applying New York law to these claims is not a close call. Defendants' Motion should be denied for three main reasons.

*First*, nowhere in their 25-page Motion do Defendants acknowledge that the employment Agreement they drafted expressly states it "shall be governed by and construed solely in accordance with the laws of the State of New York," with "irrevocabl[e] consent" to jurisdiction in New York courts. Agreement § 4(C). Alam's NYLL claim for unpaid wages derives from Defendants' obligation to pay him an annual bonus under the Agreement, which sets the amount and the payment terms, including when it must be paid. Having chosen New York law to govern the employment relationship – and having asserted a counterclaim against Plaintiff for prevailing party attorneys' fees under New York law pursuant to the Agreement – Defendants cannot now argue that another state's law applies to unpaid wage claims arising from their failure to pay the bonus.

*Second*, New York's Whistleblower Protection Law, NYLL § 740, was amended effective January 2022 to greatly expand beyond the original statute's limited coverage. Courts have already found that it applies when senior executives worked remotely but were required to travel to a defendant's New York offices for their job. Defendants do not dispute that Alam regularly traveled to New York, complained to Defendants about conduct he believed was illegal in New York, and was terminated at an in-person meeting in their Manhattan offices. No court has held that amended § 740 does not apply to these facts. Defendants analogize to wage-and-hour provisions that turn on the site where wages are earned, but unlike those provisions, § 740 is triggered by specific, adverse, retaliatory action – here, Defendants terminated Alam. That happened in New York.

*Finally*, after pages of irrelevant ad hominem attacks and a detour into inapplicable tax estoppel concepts, the Motion proffers misleading snippets of distinguishable cases. Defendants claim that Maryland law should apply, knowing full well that Maryland has no equivalent to New York's Whistleblower Protection Law. But because Defendants retaliated against Alam – who regularly worked in New York under an employment agreement with a New York choice-of-law provision – by terminating him at an in-person meeting in New York, the law of this state applies under *any* proposed choice of law scheme.

For the reasons below, Plaintiff respectfully requests that the Court deny Defendants' motion for partial summary judgment.

## STATEMENT OF FACTS

### A. Fairstead Is a New York Company and Hired Alam Under a New York Employment Agreement

The parties have exchanged document discovery but have not yet conducted depositions. Nothing produced so far contradicts the critical allegations here. In September 2020, after more than a dozen interviews at the offices of Defendant Fairstead Management LLC ("Fairstead") in Manhattan with Defendant Jeffrey Goldberg, Stuart Feldman (Fairstead's controlling shareholder), and former executives Will Blodgett and John Tatum, Fairstead hired Plaintiff Shah Alam as President of its in-house property management company. FAC ¶ 36.

Fairstead is a New York limited liability company headquartered at 250 West 55th Street, New York, New York 10019. FAC ¶ 22. It is one of the nation's largest affordable housing owners, with properties across 28 states and approximately 24,000 units valued at more than $6 billion. FAC ¶ 34. For reasons passing understanding, Defendants have refused to produce a

complete list of all the properties Plaintiff was responsible for managing while at Fairstead, but the New York market dominates Fairstead's portfolio.[1]

Goldberg is Fairstead's Chief Executive Officer. FAC ¶ 24. At all relevant times, Goldberg worked out of either Fairstead's New York office or his law firm's New York office, Sadis & Goldberg LLP, at 551 Fifth Avenue, New York, New York 10176. *Id.* At all relevant times, Goldberg was both a partner at the mid-sized New York City law firm Sadis & Goldberg LLP, where he is on the Executive Committee,[2] and CEO of Fairstead.

Defendants' Motion states in passing at page 7 that, "the terms of Plaintiff's employment are governed by an August 5, 2020 employment agreement (the 'Agreement')." The Agreement directly relates to the issues Defendants' Motion raises. Among other things,

- The Agreement was executed on letterhead from Fairstead's New York address: "Fairstead Management LLC, 250 West 55th Street, 35th Fl., New York, New York 10019." Agreement at 1;

- The Agreement states that Alam would report to "Jeffrey Goldberg and Will Blodgett," both based in New York, "taking input and approval (as applicable) from John Tatum, Head of Fairstead Affordable," also at that point based in New York. Agreement § 1(A);

- The Agreement states that it "shall be governed by and construed solely in accordance with the laws of the State of New York applicable to agreements made and/or to be performed in that State, without regard to any conflict of law or choice of law provisions thereof." It also includes an exclusive

[1] *See, e.g.*, *Fairstead Announces $20 Million Renovation of 710 Affordable Homes in Existing Bronx Portfolio* (July 30, 2025), *available at* https://fairstead.com/fairstead-announces-20-million-renovation-of-710-affordable-homes-in-existing-bronx-portfolio-to-include-new-suite-of-resident-services-to-support-community-well-being/ (stating that "In New York City, Fairstead owns and operates 29 properties, totaling more than 7,100 affordable homes. Fairstead's national footprint exceeds 25,000 residences across 28 states.") (last accessed Mar. 12, 2026).

[2] *See* https://www.sadis.com/professionals/jeffrey-c-goldberg ("Jeffrey C. Goldberg is a member of the firm's Executive Committee. Jeffrey concentrates his practice in real estate, finance and corporate, with a special focus on family offices and entrepreneurs. In his real estate practice, he represents a range of clients including owners, investors, tenants and lenders in a variety of commercial, financial and real estate transactions.") (last accessed March 12, 2026).

> forum-selection clause consenting to "the sole and exclusive personal jurisdiction of the federal and state courts located in New York County." Agreement § 4(C).

Defendants' Motion goes on at length about faithless servant issues they chose not to raise in a counterclaim, based on the premise that Plaintiff's outside business activities were inherently improper and concealed. But the Agreement contemplates that Alam would have outside business interests and set out a straightforward framework to disclose them. Section 1(G)(c) provides that Alam should not "serve as a director, employee, consultant or advisor to any other person or entity without the prior written consent of the Firm." Agreement § 1(G). The prohibition is immediately qualified by an express exception: "provided, however that you may continue to serve as a director, employee, consultant or adviser to any other person or entity that is listed on Schedule 1 hereto." *Id.*

Schedule 1 to the Agreement has Alam's handwritten notation: "Will provide list of income from personal assets and consulting upon start date." Agreement, Schedule 1. Both parties understood at the time that Alam had pre-existing personal investment assets, and the Agreement's framework was to identify and permit those interests through disclosure rather than prohibit them outright. As will be confirmed as discovery continues, Alam appropriately disclosed his outside business interests during and after his lengthy interview process at Fairstead.

Defendants drafted this Agreement, chose New York law, chose a New York forum and agree that the Agreement applies here. In their Counterclaim, Defendants (prematurely at the very least) seek to enforce the Agreement's fee-shifting provision. *See* Answer [Dkt. 41] at ¶¶ 5, 9 & 11 ("Pursuant to Section 4.G of the Agreement, the parties agreed that "[i]n any action arising out of this Agreement the prevailing party shall be entitled to an award of its reasonable

legal fees."). As the Agreement shows, Alam's employment with Fairstead revolved around New York.

### B. Under the Agreement, Alam Was Entitled to Guaranteed Annual Bonuses

Under the Agreement, Alam was paid annual base compensation and was entitled to a separate "minimum annual guaranteed bonus payment of $100,000 ('Annual Guaranteed Bonus')." Agreement § 1(D). The Annual Guaranteed Bonus was to "be paid to you in full in one lump sum payment no later than March 31st of the following calendar year." *Id.* If Alam was "terminated without Cause during the calendar year," he was "eligible for a pro-rata share of the Annual Guaranteed Bonus." *Id.* As this Court found in the MTD Order, Fairstead was obligated to pay Alam's 2022 Annual Guaranteed Bonus of $100,000 no later than March 31, 2023. MTD Order at 11. It did not do so.

Instead, Fairstead paid only in April 2024, more than a year late and only after this lawsuit was filed. SoMF ¶ 12. Fairstead subsequently paid $9,320.55 in interest in April 2025. SoMF ¶ 13. Defendants claim without support that "at Plaintiff's request," they "allowed Plaintiff to remain on Fairstead's payroll through July 7, 2023 in lieu of payment of his 2022 Guaranteed Bonus." Motion at 7. This is typical dissembling. Defendants do not explain when, how or why Alam supposedly "requested" that they delay a bonus due in March 2023 until April 2024.

### C. Alam Regularly Worked From Fairstead's New York Offices at Defendants' Direction

Alam often worked from Maryland during his tenure, initially from his home in Mount Airy, Maryland, and later from a Fairstead office in Bethesda. FAC ¶ 37. Throughout the Motion and Goldberg Declaration, Defendants repeatedly refer to this Bethesda location as

"Fairstead's Maryland Headquarters," using payroll code "HQMD" as if it were a corporate designation equal to Fairstead's *actual* headquarters at 250 West 55th Street in Manhattan.

But outside litigation, Fairstead described its Bethesda location as a "mid-Atlantic" regional office – a satellite outpost opened during COVID, staffed through Alam's tenure, and relocated after he left.[3] Fairstead's actual headquarters, where Goldberg works, senior management is based, Alam was required to travel regularly, and where he was fired, has always been in New York.

As alleged in the Complaint and confirmed by documents, Defendants regularly and often required Alam to travel to Fairstead's offices in New York City to work from there. FAC ¶ 38. On these routine trips to work out of Fairstead's offices, Alam typically stayed in New York for multiple days. *Id.*; *see also* Goldberg Declr. ¶ 12 (documenting, for the artificially abbreviated period of January 2022 to May 2023, several multi-day stays in New York by Alam, including February 28 to March 2, 2022 (three days), November 1 to 3, 2022 (three days), and February 27 to March 1, 2023 (three days).

Documents confirm how often Alam worked in New York. Defendants' productions establish that during his approximately 30-month tenure (September 2020 through May 2023), Alam used his key card to enter the Manhattan offices on at least 38 days. Goldberg Declr. Ex. 7. He also incurred travel-related expenses in New York on more than 50 days when for whatever reason he did not use his key card. Conklin Exs. A & B. In total, documents reflect at the very least 88 days of physical presence in New York over 30 months, about three days per month.

---

[3] *See* https://fairstead.com/affordable-housing-giant-fairstead-moves-regional-hq-from-bethesda-to-d-c/ (last accessed Mar. 10, 2026).

Acknowledging how often Alam traveled to New York, Defendants mischaracterize the record in multiple ways. Without caselaw support,[4] their brief cherry-picks data from a narrower 17-month window (January 2022 to May 2023), counts only 14 keycard swipes and 21 expense-report days, then labels this "extremely sporadic and entirely merely incidental." Motion at 10, 17. But this is hardly "sporadic," and Defendants' own documents covering the full period show more extensive presence.

Goldberg's Declaration purports to summarize documents relating to 16 separate business trips to New York during this period, about one trip per month. Several involved multi-day stays. Goldberg tries to minimize these trips by emphasizing early-morning departures and late-afternoon arrivals, but his exhibits establish a regular travel pattern. Moreover, Goldberg acknowledges that keycard swipes "do not show the full extent of an employee's work travel," admitting Alam's New York presence exceeded what the keycard records alone reflect. Even Defendants' artificially narrowed numbers – 35 documented days in 17 months– reflect travel to New York twice monthly, and the documentary record represents a floor, not a ceiling.

Alam's regular presence in New York was not personal choice – Fairstead required it. The company mandated travel to its Manhattan headquarters because that is where senior leadership was based, including Alam's supervisor Goldberg, and where key management decisions were made. FAC ¶¶ 24-26, 38.

[4] *See, e.g., Pickering v. Teladoc Health Inc.*, No. 24-445-RGA-SRF, 2025 WL 2802954, at *7 (D. Del. Oct. 1, 2025), *report and recommendation adopted*, 2025 WL 3171192 (D. Del. Nov. 13, 2025), finding relevant to applicability of NYLL § 740 that while plaintiff spent "a large majority of his time as an employee … working remotely from Delaware," in a prior job for defendant, "Plaintiff physically would work in the state of New York for approximately one week every quarter of the year," after being promoted, "[a]t times as a Senior Director [] physically would work in New York," and after he made an ethics complaint, "he was hauled to New York and interrogated/interviewed.").

Defendants' comparison of Alam's New York presence to other states misses the point. Motion at 10. Alam did not have an employment agreement governed by Texas, Florida, or Nevada law. He was not required to report to Fairstead offices in those states to meet with his boss in person. He was not terminated there. The Agreement, the headquarters, the decision-makers, the protected activity, and the retaliation all point to New York.

### D. Alam Reported Concerns to Fairstead's Owner and Was Terminated at Fairstead's New York Offices

In early 2023, Fairstead's owner Stuart Feldman met with employees to gauge company performance. FAC ¶ 57. Alam met with Feldman at Fairstead's offices and shared his candid views. FAC ¶ 58. Among other things, he told Feldman that Goldberg had violated labor laws by firing employees without paying them what they were owed. FAC ¶ 60. Alam left believing Feldman appreciated his honesty and intended to make positive changes. FAC ¶ 62.

Instead, on May 11, 2023, Defendants summoned Alam to Fairstead's New York offices for a meeting with Goldberg and General Counsel Seth Hoffman. FAC ¶ 63. There, Goldberg told Alam he knew about the conversation with Feldman and declared that because of Alam's comments, they would "go their separate ways." *Id.* Goldberg fired Alam in retaliation for his warnings about legal and regulatory violations. FAC ¶ 16.

As this Court found in its MTD Order, Alam's surviving whistleblower claims under NYLL §§ 740 and 215 are based on his report to Feldman that "Goldberg violated labor laws by firing Fairstead employees without paying them what they were owed," which resulted in his termination. MTD Order at 29. The protected activity (Alam's report to Feldman), the retaliatory decision-maker (Goldberg, a New York-based individual defendant), and the retaliatory act (the in-person termination meeting) all occurred in New York, at Fairstead's New York offices, involving New York-based senior management.

### E. Defendants' Withholding of Maryland Taxes Is Not a Legal Determination About Which Law Governs

Defendants emphasize that Fairstead's paystubs withheld Maryland income taxes and that Alam's tax returns reported his wages as Maryland wages. Motion at 8-9, 15-16. But tax sourcing rules and whether New York Labor Law applies are different inquiries serving different purposes.

Alam's 2020 tax correspondence with the New York State Department of Taxation and Finance concerned a W-2 issued by Fairstead's payroll administrator, Prestige, which had reported some of Alam's wages as New York wages. Motion at 9. Alam's correspondence attempted to correct his employer's payroll coding and was not an independent legal determination about which state's labor law governed his employment relationship. That Fairstead's own payroll system coded Alam as a Maryland employee for tax purposes does not determine whether NYLL's wage-payment provisions or whistleblower protections apply to the employment relationship. Nor does tax coding override the Agreement's express terms, which provide that the employment relationship "shall be governed by and construed solely in accordance with the laws of the State of New York." Agreement § 4(C).

### F. Defendants' Practice of Making Employees 'Run the Departure Gauntlet'

Defendants' motion is styled as one for summary judgment based on supposedly undisputed facts, but is focused on disputed, irrelevant and offensive allegations about allegedly "faithless" actions by Alam. It is part of a longstanding pattern of Defendants forcing their employees to "run the departure gauntlet" by manufacturing reasons to avoid paying them what they are owed. One of the founders of Fairstead's affordable housing business, John Tatum – who helped recruit Plaintiff to Fairstead and was deeply involved in interviewing him for the job – claimed that after he left Fairstead on what he thought were good terms, Fairstead offered to

buy his equity interests at an unfair lowball price. When he turned it down, Fairstead in bad faith retroactively terminated him for cause and declared that all his equity interests were forfeited. In an October 2025 post-trial opinion, the Delaware Chancery court agreed with Tatum. Conklin Ex. C at 65 ("When recharacterizing Tatum's termination, Feldman and Goldberg sought to manufacture a dishonest reason to harm Tatum, not to act honestly and in the best interests of Fairstead Affordable. Tatum proved that Feldman and Goldberg breached their contractual obligation to act in good faith by making him run the departure gauntlet.").

Before that, Fairstead principal Stuart Feldman's then-CFO Charles Blue accused Feldman of firing him in retaliation for opposing Feldman's plan to deny severance to another executive based on fabricated "cause." In response, Feldman claimed he was in fact Blue's victim. The jury awarded Blue a $2.5 million verdict, including a $200,000 punitive damages award against Feldman personally. *Charles Blue v. Hanover Direct Inc., William Wachtel, Wayne Garten and Stuart Feldman*, 2009 WL 1199232 (N.J. Super. Ct. Mar. 3, 2009).

This Motion is more of the same.

## **LEGAL STANDARD**

In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). A genuine dispute of material fact "exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007) (citation omitted). Alam, as the nonmoving party, is entitled to have all reasonable inferences drawn in his favor. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a

reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

In employment cases, it is well-settled that "[c]aution should be exercised in addressing summary judgment motions … where intent and state of mind are at issue because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'" *Velez v. McHugh*, No. 09-CV-0925, 2011 WL 778693, at *2 (S.D.N.Y. Mar. 2, 2011); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) ("courts must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law").

## <u>ARGUMENT</u>

### I. NEW YORK LAW APPLIES TO ALAM'S WHISTLEBLOWER CLAIMS

Since (i) Alam worked for Defendants under an employment agreement with a New York choice-of-law provision, (ii) Defendants required Alam to regularly and routinely travel to New York for his job, and (iii) Alam engaged in protected whistleblowing activity in New York and Defendants ultimately retaliated against him by terminating him at an in-person meeting in New York, New York law applies to his whistleblower retaliation claims under NYLL §§ 215 & 740. New York law particularly applies to Alam's NYLL § 740 claim.

Section 740, the New York Whistleblower Protection Law, was amended effective January 26, 2022 to "greatly expand the limited coverage offered by the original ... statute." *Accettola v. He*, No. 23-cv-1983 (LJL), 2025 WL 843412, at *9 (S.D.N.Y. Mar. 18, 2025). Among other things, the prior version of the law required that any employee seeking Section 740's protection disclose or threaten to disclose actions by the employer that both (1) *actually* violated a law, rule, or regulation, and (2) posed a substantial and specific *danger to public*

*health* or safety. *Rinaldi v. Mills*, No. 21-2630, 2022 WL 17480081, at *2 (2d Cir. Dec. 7, 2022) (emphasis added).

Amended NYLL § 740 prohibits an employer from "tak[ing] any retaliatory action against an employee ... because such employee ... discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation," or because the employee "objects to, or refuses to participate in any such activity, policy or practice." NYLL § 740(2)(a), (c); *see also Goldberg v. Bespoke Real Est. LLC*, No. 23 Civ. 5614 (JPO), 2024 WL 1256006, at *3 (S.D.N.Y. Mar. 25, 2024).

The amended statute expanded coverage to allow claims by employees, former employees and independent contractors, NYLL § 740(1)(a), and expressly bars "actions or threats to take such actions that would adversely impact a former employee's current or future employment." NYLL § 740(1)(e)(ii). Unlike many NYLL provisions, NYLL § 740 contains a venue provision that claims "may be brought in the county in which the alleged retaliatory action occurred, in the county in which the complainant resides, or in the county in which the employer has its principal place of business." NYLL § 740(4)(b). The 2022 amendment also provides plaintiffs with the right to a jury trial.[5] *Id.*

[5] The 2022 amendment made other changes to the statute that expanded protections to whistleblowers, including that the statute now: (i) applies to whistleblowing "whether or not within the scope of the employee's job duties," NYLL § 740(2); (ii) extends the statute of limitations from one year to two, § 740(4)(a); (iii) expands remedies to include front pay (§ 740(5)(b)), civil penalties up to $10,000 (§ 740(5)(f)), and punitive damages "if the violation was willful, malicious or wanton" (§ 740(5)(g)), in addition to pre-existing remedies of injunctive relief, reinstatement, back pay, and attorney's fees; (iv) eliminates an election-of-remedies bar that had required employees to choose between a § 740 claim and other available remedies, § 740(7); and (v) requires employers to inform employees of their § 740 rights by posting a conspicuous notice, §740 (8).

Since amended NYLL § 740 became effective, courts considering whistleblower retaliation claims brought by executives that were required to travel to New York as part of their job duties have found they are covered by the statute. *See, e.g., Pickering v. Teladoc Health Inc.*, No. 24-445-RGA-SRF, 2025 WL 2802954, at *7 (D. Del. Oct. 1, 2025), *report and recommendation adopted*, 2025 WL 3171192 (D. Del. Nov. 13, 2025) (plaintiff "labored" in New York for purposes of NYLL § 740 whistleblower claims where Plaintiff worked remotely from his Delaware residence, but "was required to travel to Teladoc's New York office on several occasions over the course of his employment," and was called to New York to be interviewed about his whistleblowing); *cf. Goldberg*, 2024 WL 1256006, at *3, 11 (denying motion to dismiss NYLL § 740 claim brought by plaintiff who generally "worked at the entity's Miami Beach Office" during the relevant period) (cited in the Motion to Dismiss Order, Dkt. No. 32 at 29).

Defendants cannot and do not dispute that Alam worked under an employment agreement with a New York choice-of-law provision, regularly traveled to New York as part of his job, or that Defendants terminated him at an in-person meeting in Defendants' offices in New York for complaining to Defendants about conduct he believed was illegal in New York. Amended NYLL § 740 applies to these facts and no court has held otherwise.

## II. NEW YORK LAW APPLIES TO ALAM'S UNPAID WAGE CLAIMS

### A. The Agreement's Choice of Law Provision Means NYLL Applies

Defendants' Motion conspicuously ignores the Agreement's express New York choice-of-law provision. Section 4(C) states unambiguously that the Agreement "shall be governed by and construed solely in accordance with the laws of the State of New York applicable to agreements made and/or to be performed in that State, without regard to any conflict of law or choice of law provisions thereof." Defendants – who drafted the Agreement – now ask the Court

to apply Maryland law while simultaneously pursuing a counterclaim for attorneys' fees under New York law pursuant to the same Agreement. Their blatantly inconsistent position on New York law is untenable and unsupported. *See, e.g., Levinson v. Primedia Inc.*, No. 02 Civ. 2222, 2007 WL 2298406, at *12 (S.D.N.Y. Aug. 9, 2007) ("Defendants also argue that Plaintiffs who worked outside New York are outside the purview of Articles 6 and 19 of New York Labor Law. … An agreement to apply New York law to a contract is tantamount to an agreement to apply New York statutory law to disputes about commissions owed under said contract.").

Under *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 474 (2015), "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract, even if the contract is one that does not fall within General Obligations Law § 5-1401." Defendants bear the burden of establishing why this Court should deviate from an express choice-of-law provision. They have not even tried to do so.

Since *Ministers & Missionaries*, courts have strictly enforced choice-of-law provisions in employment agreements. *See generally Willis Re Inc. v. Herriot*, 550 F. Supp. 3d 68, 91-93 (S.D.N.Y. 2021) (stating that *Ministers & Missionaries* was a "game changing" New York Court of Appeals decision that meant express New York choice-of-law provisions remove the need to apply either a common-law, conflict-of-law analysis or a statutory choice-of-law directive); *Medtronic Inc. v. Walland*, No. 21 Civ. 2908 (ER), 2021 WL 4131657, at *2 (S.D.N.Y. Sept. 10, 2021) (finding that even after *Ministers & Missionaries*, New York courts should not enforce a choice-of-law provision where (1) the chosen law bears no reasonable relationship to the parties or the transaction or (2) where the chosen law violates some fundamental policy of a state that has a materially greater interest than does the chosen state); *cf. John H. Chun, 2 Approaches to NY Choice of Law in Employment Contracts*, LAW360 (May 13, 2022), *available at*

https://www.herrick.com/publications/2-approaches-to-ny-choice-of-law-in-employment-contracts/ (last accessed Mar. 12, 2026).

Unlike statutory claims that arise independently of the employment relationship such as discrimination claims under the NYCHRL, Count Four's NYLL § 193 claims arise directly and exclusively from the Agreement's § 1(D). The Agreement establishes the Annual Guaranteed Bonus amount, dictates when it must be paid, and defines when a pro-rata share becomes payable. Without the Agreement, there would be no bonus obligation to enforce. The NYLL § 193 claim is thus not an independent statutory cause of action but a way to enforce the contractual bonus obligation. Under *Ministers & Missionaries* and its progeny, the parties' express selection of New York law governs this dispute.

**B. Alam Is Entitled to Liquidated Damages**

Violating NYLL § 193 carries a presumption of liquidated damages up to 100% of the claim under NYLL § 198(1-a),[6] *unless* the employer proves its good faith. The Second Circuit has acknowledged that burden is "a difficult one," and emphasized that "double damages [are] the norm and single damages the exception."[7] Defendants have pleaded a good faith affirmative defense[8] but cannot satisfy this standard.

---

[6] Under NYLL § 198(1-a), damages include, "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due."

[7] *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (discussing materially identical FLSA liquidated damages provisions).

[8] *See* Answer at 12th Affirmative Defense, "Plaintiff's claims are barred, in whole or in part, because *Defendants, at all times, acted in good faith to comply with all applicable laws, including the New York Labor Law* ..." (Emphasis added.)

This "good faith" standard from NYLL is similar to the FLSA standard for employer good faith in determining whether to assess liquidated damages. *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015) ("[C]ourts have not substantively distinguished between the federal standard from the [NYLL] standard of good faith."); *see also Rana v. Islam*, 887 F.3d 118, 122-23 (2d Cir. 2018) (after 2010 amendments to NYLL liquidated damages statute, "NYLL and FLSA liquidated damages provisions are identical in all material respects, serve the same functions, and redress the same injuries.").

The good faith defense requires an employer to show (1) that its "act or omission" leading to liability "was in good faith" and (2) that the employer "had reasonable grounds for believing that his act or omission was not a violation." *Chavez-Deremer v. Sarene Servs., Inc.*, No. 20-cv-3273, 2026 WL 467788, at *25-26 (E.D.N.Y. Feb. 18, 2026). For the first prong, "good faith" requires an employer to demonstrate "that it took active steps to ascertain the dictates of the [law] and then act to comply with them." *Id.* For the second, an employer lacks objectively reasonable grounds for believing that it was in compliance with the law when it "recklessly disregarded the possibility that [it] was violating" the law. *Id.*; *cf. Alvarez v. IBP, Inc.*, 339 F.3d 894, 910 (9th Cir. 2003), *aff'd on other grounds*, 546 U.S. 21 (2005) (distinguishing "ex post explanation and justification" from "the necessary affirmative 'steps' to ensure compliance," and holding that an employer who "offers no evidence to show that it actively endeavored to ensure such compliance" cannot satisfy the good faith burden). Fairstead cannot satisfy either prong.

*First*, the Agreement unambiguously required payment of the 2022 bonus "no later than March 31st of the following calendar year." Agreement § 1(D). Fairstead drafted this provision and knew exactly what it required. *Second*, Fairstead withheld the bonus until April 2024, more

than a year late, and only paid it after Alam sued them for it. A payment extracted through litigation is an admission that the obligation existed and was knowingly ignored, not evidence of good faith compliance. *Third*, Fairstead's subsequent payment of $9,320.55 in interest concedes that the bonus was owed and overdue. *E.g.*, Motion at 5. An employer cannot simultaneously pay interest on a belated wage payment and claim it had a good-faith basis for withholding that wage. Fairstead has never identified a contemporaneous legal basis for its failure to pay by March 2023, offers no evidence of consultation with counsel about whether the bonus was due, and points to no proactive compliance effort of any kind. Strategically waiting to pay mandatory wages until after an employee sues is not "good faith," it is precisely the kind of conduct the NYLL's liquidated damages provision is designed to deter.

## III. THE MOTION'S OTHER DEFENSES FAIL

Defendants devote several pages to arguing (i) that Alam is "tax estopped" from asserting NYLL claims, and (ii) that his alleged competitive activities mean Maryland law applies. These arguments are transparent attempts to poison the well and are legally irrelevant to the questions presented.

### A. Tax Estoppel Doctrine Does Not Bar Alam's Claims

The tax estoppel doctrine from *Mahoney-Buntzman v. Buntzman*, 12 N.Y.3d 415 (2009), has no application here. It has never been used to determine which state's labor law governs employment. Courts have consistently held that withholding New York taxes does not create NYLL coverage, and by the same logic, withholding Maryland taxes does not destroy it.

Fundamentally, Alam did not make a voluntary, strategic factual representation like the defendant in *Mahoney-Buntzman*. Fairstead's payroll department coded Alam as "HQMD" — Fairstead chose the withholding state, issued W-2s reflecting that choice, and withheld only Maryland taxes. Motion at 8. Alam's 2020 tax correspondence reported what Fairstead's coding

told him to report, while *Mahoney-Buntzman* requires a party to have taken a position "for [his] own benefit." 12 N.Y.3d at 422. A taxpayer filing returns reflecting his employer's unilateral W-2 coding has not made an independent factual assertion about where he works, he has followed his employer's instructions. Defendants' argument is circular: because Fairstead coded Alam as Maryland and issued Maryland W-2s, Alam is supposedly bound by returns reflecting Fairstead's coding decisions.

Defendants' tax estoppel theory highlights another limit to the doctrine, that it does not resolve mixed questions of fact and law. *See In re Tran*, No. 2012-1785/A, 2014 WL 2216162, at *2 (Sur. Ct. N.Y. Cnty. May 22, 2014) ("[A]lmost all of the estoppel cases have involved inconsistencies as to fact, rather than ... mixed questions of fact and law.") (declining to apply doctrine where question "involve[d] a complex mix of fact and law"). As with judicial estoppel, "[t]he submission of a legal argument is of a different character than an inconsistent framing of one's factual pleadings, and therefore not a basis for [the doctrine]." *Matter of Excelsior 57th Corp. (Kern)*, 218 A.D.2d 528, 529-30 (1st Dep't 1995). Courts have also held that certain tax return designations give way in litigation to controlling statutory definitions. *Wood v. Artifact Props., LLC*, 169 A.D.3d 1503, 1505 (4th Dep't 2019) (ruling that defendant's classification of certain property as "commercial" in tax filings "d[id] not estop it from relying upon the [one- or two-family home] exemption in this action.").

Because the doctrine is fundamentally inapplicable, Defendants have not cited (and cannot cite) a case applying *Mahoney-Buntzman* to determine which state's labor law governs an employment relationship. Indeed, courts in this Circuit have held that withholding New York State and New York City taxes from a plaintiff's compensation does not create NYLL coverage when none exists. *Magner v. Alvanon, Inc.*, No. 24-cv-09190, 2026 WL 550017, at *6

(S.D.N.Y. Feb. 26, 2026) (that defendants "applied New York State and New York City taxes" to plaintiff's compensation was irrelevant to whether NYLL applied, since "at all relevant times, [plaintiff] alleges he was exclusively working in Pennsylvania"); *cf. In re Stage Presence Inc.*, 559 B.R. 93, 100 (Bankr. S.D.N.Y. 2016), *aff'd*, No. 18-cv-10662 (JSR), 2019 WL 2004030 (S.D.N.Y. May 7, 2019) (finding NYLL did not apply even though paying plaintiffs' wages "was to be made in New York by a New York payroll entity, using a New York payroll processing accounts and New York bank accounts," since "all of the work performed by [plaintiffs] was performed in the District of Columbia"). Whether another state's taxes were withheld from a plaintiff's compensation does not bar NYLL claims where they do exist.

The tax estoppel doctrine has no application here, where Plaintiff's tax returns reflected wage sourcing that Defendants' own payroll administrator Prestige coded on the W-2s that Defendants issued. Plaintiff did not gain any tax advantage from reporting Maryland wages since he would have owed comparable taxes regardless. There is no inconsistent position taken for strategic benefit, which is what *Mahoney-Buntzman* intended to prevent.

### B. Defendants' 'Faithless' Conduct Allegations Are Disputed, Scurrilous and Irrelevant

Defendants devote nearly four pages of their Motion (pages 10-13) and five paragraphs of their 56.1 Statement (¶¶ 16-20) to allegations that Plaintiff operated competing businesses, recruited Fairstead employees, and covertly purchased Edgewood Management Corporation while at Fairstead. But Defendants concede these allegations are not the basis for this Motion. "While Plaintiff's NYLL claims may now be dismissed on jurisdictional grounds, these faithless activities are described here to further demonstrate Plaintiff was never a New York employee." Motion at 12. The concession is telling: Defendants included this material to smear Plaintiff. If

these allegations bear on any issue before the Court, they raise contested questions that cannot be resolved on summary judgment.

Even if every allegation in Defendants' faithless-servant tale were true – and it is not – the allegations would still be legally irrelevant. The question is whether NYLL applies to Alam's claims, which turns on where he "labored," whether the Agreement's choice-of-law clause governs, and whether the retaliatory conduct had an impact in New York. It does not turn on whether Alam appropriately disclosed outside business interests. The faithless-servant doctrine is a merits defense to a wage claim, not a jurisdictional argument about which state's law applies. The parties have also taken no depositions, and Defendants' characterization of Alam's conduct is an entirely one-sided contested factual narrative that this Court cannot resolve on summary judgment. *See* Fed. R. Civ. P. 56(a).

As explained above, the Agreement states that Alam should "not serve as a director, employee, consultant or advisor to any other person or entity without the prior written consent of the Firm" but then provides an express exception: "however [] you may continue to serve as a director, employee, consultant or adviser to any other person or entity that is listed on Schedule 1 hereto." Agreement § 1(G). Alam's business interests that pre-dated his employment at Fairstead were fully disclosed during the interview process and discussed with multiple Fairstead managers including Goldberg. Defendants now focus on them, feigning surprise as part of forcing employees to "run the departure gauntlet" by manufacturing reasons to avoid paying employees what they are owed.

## IV. THE MOTION'S NYLL ANALYSIS MISSES THE MARK

Defendants do not dispute that (i) the Agreement has a New York choice-of-law provision; (ii) Alam regularly traveled to New York, at least 90 times in 30 months based on documents alone; and (iii) he complained to Defendants about conduct he believed illegal in

New York and was terminated at an in-person meeting in Defendants' Manhattan offices. NYLL §§ 740, 215 and 190 apply here.

The Motion ignores recent applications of amended NYLL § 740 to claims by executives in *Pickering v. Teladoc Health Inc.*, No. 24-445-RGA-SRF, 2025 WL 2802954 (D. Del. Oct. 1, 2025) and *Goldberg v. Bespoke Real Est. LLC*, No. 23 Civ. 5614, 2024 WL 1256006 (S.D.N.Y. Mar. 25, 2024). Instead, Defendants focus on an artificial window of Alam's travel in 2022-23, comparing it to cases with tangential New York connections where courts found NYLL inapplicable. All are distinguishable. Moreover, under the alternative choice-of-law analyses Defendants propose – the "impact" test from *Syeed v. Bloomberg L.P.*, 58 F.4th 64 (2d Cir. 2023), applied in the context of NYSHRL and NYCHRL claims, and the "conduct regulation" test from *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519 (1994) – New York law still applies.

**A. The Cases the Motion Cites Are Not Controlling**

The Motion argues that "courts have properly determined that the NYLL does not apply extraterritorially." Motion at 17. But New York courts have never adopted a brightline rule barring extraterritorial application. *Hobbs v. Knight-Swift Transp. Holdings, Inc.*, No. 21-cv-01421, 2025 WL 1577271, at *16 (S.D.N.Y. June 4, 2025); *see also Magner v. Alvanon Inc.*, No. 24-cv-09190, 2026 WL 550017, at *4 (S.D.N.Y. Feb. 26, 2026) ("[T]he bar to the extraterritorial application of the NYLL does not control in all circumstances."). The Motion spends a page discussing *Kim v. Family Bob Inc.*, No. 20-cv-906, 2021 WL 7906544 (E.D.N.Y. Jan. 26, 2021), which found NYLL did apply to an hourly kitchen worker's unpaid overtime claims except for a period when "all of plaintiff's working hours were spent in New Jersey." *Id.* at *6.

The "laboring" test Defendants urge the Court to adopt – developed for wage and hour statutes, and which Defendants treat as synonymous with "physically in New York during the entire workday" (Motion at 17) – does not apply to § 740. Section 740 is not a wage statute; it is

a whistleblower protection law with its own structure, venue provision, and legislative history reflecting a distinct public-policy purpose.

The 2022 amendments expanded coverage to include former employees and independent contractors (NYLL § 740(1)(a)), categories of individuals who may have no ongoing physical presence in New York. This expansion is incompatible with Defendants' conception of "laboring in New York" as daily office work in New York," which the statute cannot require as a prerequisite. Moreover, § 740(4)(b)'s venue provision focuses on "the county in which the alleged retaliatory action occurred," keying coverage to the location of retaliation, not work.

Where a senior executive's employer is headquartered in New York, his employment contract is governed by New York law, he regularly traveled to New York, his bonus obligation originated from New York compensation decisions, and he was terminated in retaliation at a New York meeting, resulting claims are subject to NYLL.

Lacking controlling authority, Defendants try to compensate with sheer quantity. Every case Defendants cite is distinguishable and lacks one or more critical elements present here. *See, e.g., Carnett v. TIAA Ins. Co.*, 24-CV-9991, 2026 WL 35348, *3 (S.D.N.Y. Jan. 6, 2026) (dismissing claims from Connecticut plaintiff who alleged she "traveled to New York City for work purposes approximately once every six weeks," because "*Crucially, she does not allege that any discriminatory conduct took place while she was in New York City*.") (emphasis added); *Melius v. Restaurant Opportunities Ctr. United, Inc.*, No. 21-cv-02554, 2021 WL 4868557, *11 (S.D.N.Y. Oct. 15, 2021) (dismissing claims from D.C.-based plaintiff because "the SAC does not make clear whether any of the incidents on which Melius bases her claims took place while she was in New York," but stating that, "This Court has found that '*To the degree incidents of harassment or retaliation occurred while [plaintiff] was in New York City, the Court sees no*

*reason those claims cannot proceed. …*") (emphasis added); *see also Ware v. L-3 Vertex Aerospace*, 833 Fed. Appx. 357, 358-60 (2d Cir. 2020) (affirming dismissal where employee did not reside in New York, signed employment contract in Mississippi, was trained in Mississippi, was employed abroad, and sole New York connection to was employer parent company); *Fried v. LVI Servs., Inc*., 500 Fed. Appx. 39, 42 (2d Cir. 2012) and *Fried v. LVI Servs., Inc*., No. 10 Civ. 9308, 2011 WL 4633985, *6-7 (S.D.N.Y. Oct. 4, 2011) (dismissing claims and affirming dismissal where plaintiff "at all times relevant to his complaint lived and worked in Connecticut" and was fired via letter); *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 288 (2010) (upholding dismissal of claims from Georgia resident based in Atlanta, who "attended quarterly meetings in New York City" but was terminated by the NYC-based publisher over the phone while in Atlanta); *Dittes v. ChargeAfter USA, Inc*., No. 24-CV-746 (RA), 2025 WL 1984273, at *3-4 (S.D.N.Y. July 17, 2025) (dismissing claims with leave to amend where Plaintiff did not allege she lived or worked in New York and plaintiff went to New York "once or twice"); *Hubbell-Petang v. Hotel Rsrv. Serv*., No. 20 Civ. 10988, 2022 WL 602900, at *1 (S.D.N.Y. Mar. 1, 2022) (dismissing claims because plaintiff "resided in Dallas and solely worked from the Dallas office or her home, except for one work trip to HRS's Germany office"); *Pakniat v. Moor*, 192 A.D.3d 596, 596-97 (1st Dept. 2021) (upholding dismissal of claims because "plaintiff was living and working in Montreal, Canada, at the time of the alleged discriminatory conduct and she failed to allege that the conduct had any impact in either New York State or New York City"); *Kingston v. Int'l Bus. Machines Corp*., 187 A.D.3d 578, 579 (1st Dept. 2020) (upholding dismissal of claim from plaintiff who "lived in Texas and worked in his home office there," and traveled to New York "two to three times a year" with no evidence of retaliation while in New York).

Here, Alam documented at least 88 days physically present in New York over 30 months, was terminated there after engaging in protected whistleblowing there, and he worked under an Agreement with a New York choice-of-law provision. Defendants' torrent of inapposite cases does not change this calculus.

**B. New York Choice of Law Analysis Mandates NYLL**

Defendants claim that "recent decisions decided in the context of the NYSHRL and NYCHRL further support dismissal here," and cite to the "impact" requirement, allegedly from *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 452 (2024). But the "impact" test for non-resident NYSHRL and NYCHRL claimants analyzed in *Syeed v. Bloomberg L.P.*, 58 F.4th 64 (2d Cir. 2023) "turn[s] primarily on the *plaintiff's physical location at the time of the alleged discriminatory acts*." *Id.* at 69 (emphasis added); *see also Johnson v. Everyrealm, Inc.*, 657 F.Supp.3d 535, 557 (S.D.N.Y. 2023) ("[D]efendants contend that it is categorically 'clear' that a plaintiff may not bring a claim under the NYCHRL 'when the plaintiff did not work in New York,' [but] that statement is wrong as a matter of law … the impact requirement ... turn[s] primarily on the plaintiff's physical location at the time of the alleged discriminatory acts."); *Kraiem v. JonesTrading Institutional Servs. LLC*, 492 F. Supp. 3d 184, 199-200 (S.D.N.Y. 2020) (sustaining NYCHRL claims by a non-New York resident who lived in London based on conduct during business trip to New York City). Here, the retaliatory act was terminating Alam at Defendants' New York City offices. Under the impact test, New York law applies.

Defendants separately argue that under *Kim v. Family Bob Inc.*, "Claims arising under the NYLL concern conduct regulation and, where the work occurs in more than one state, a New York choice-of-law analysis is appropriate to determine whether New York is the jurisdiction with the greater interest in the dispute, such that New York law applies." No. 20-cv-906, 2021

WL 7906544, at *5-6 (E.D.N.Y. Jan. 26, 2021) (citing *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994)). Under this related choice-of-law analysis, New York law also applies.

The first step in a New York choice-of-law analysis is to determine whether there is an actual conflict between the laws of the jurisdictions involved. *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993). "Where no conflict exists between the laws of the jurisdictions involved, there is no reason to engage in a choice of law analysis." *Elsen v. Defren*, 283 A.D.2d 109, 114 (1st Dep't 2001); *see also Smith v. Mitlof*, 148 F. Supp. 2d 279, 285 (S.D.N.Y. 2001) (same). Here, there is no conflict between New York and Maryland law because New York recently amplified NYLL § 740 protections for whistleblowers, and Maryland has no comparable private-sector whistleblower statute. *See, e.g., Wholey v. Sears Roebuck*, 370 Md. 38, 57 (2002) ("the Legislature, quite simply, has declined to provide a statutory remedy for *private* employee-whistleblowers"). Maryland has no affirmative policy interest in *denying* whistleblower protection to employees like Alam or permitting retaliation, it simply has not legislated in this space. Yet applying Maryland law would extinguish Alam's whistleblower claims entirely. In the absence of a conflict, New York law should apply.

The next step in a New York choice-of-law analysis under *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519 (1994) would be to determine whether the rules in question are "conduct-regulating," or "loss-allocating." In *Padula*, the plaintiff, a New York resident who was injured on a job site in Massachusetts that was owned by a New York corporation, sued the corporation for violating New York Labor Law provisions that require adequate safety measures at a worksite. The New York Court of Appeals declined to adopt an absolute bar to the claims based on the fact that the work was performed out-of-state, and instead performed a choice-of-law analysis that divided claims into "conduct-regulating rules" and "loss allocating rules":

> [W]hen the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort will usually have a predominant, if not exclusive, concern … If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders …

84 N.Y.2d at 522 (citations omitted); *see, e.g., Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 49 (2d Cir. 2013) ("[I]f conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the [allegedly tortious acts] occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."); *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996) ("Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws."); *Magner*, 2026 WL 550017, at *4 (choice-of-law analysis under *Padula* is appropriate for employees who work contemporaneously in multiple states).

Here, the locus of the tort is New York, where Alam was fired at an in-person meeting as retaliation for his whistleblowing. New York has a clearly greater interest in regulating Defendants' actions – Maryland has no equivalent to NYLL § 740 and any whistleblower retaliation claims would be dismissed under Maryland law. Every choice of law analysis Defendants cite leads to the same result: NYLL applies to Alam's claims.

## CONCLUSION

For all of these reasons, this Court should deny Defendants' motion for partial summary judgment.

**Dated**: New York, New York
March 13, 2026

*/s/ Donald Conklin*

Donald Conklin
Rishi Bhandari
MANDEL BHANDARI LLP
80 Pine St., 33rd Floor
New York, NY 10005
(212) 269-5600
dc@mandelbhandari.com
rb@mandelbhandari.com

*Attorneys for Plaintiff Shah Alam*

Word Count: 8,469